1

2

3

4          IN THE UNITED STATES DISTRICT COURT FOR THE

5                 EASTERN DISTRICT OF CALIFORNIA

6

7   ANGIE MELISSA CASTRO, by her          )   1:10-cv-618  AWI  BAM
    guardian ad litem Blanco Estela Castro, )
8   individually and as successor in interest )
    to ANGEL ANTONIO MENDOZA             )   ORDER ON DEFENDANTS'
9   SARAVIA, BLANCA ESTELA               )   MOTION FOR SUMMARY
    CASTRO, TERESA REYNA                 )   JUDGMENT AND ORDER
10  MENDOZA-SARAVIA, and PEDRO           )   REMANDING CASE TO
    MENDOZA,                             )   STATE COURT
11                                       )
                    Plaintiffs,          )
12          v.                           )
                                         )
13  CITY OF MENDOTA, COUNTY OF           )
    FRESNO, WEST COAST                   )
14  AMMUNITIONS, and DOES 1 through      )
    100, inclusive,                      )
15                                       )
                    Defendants.          )
16  _____  )

17

18

19        This case stems from the death of Angel Antonio Mendoza Saravia ("Angel") during an

20  encounter with deputies from the Fresno County Sheriff's Office.  Plaintiffs are Angel's family

21  members.  Plaintiffs originally filed suit in the Fresno County Superior Court, but the Defendants

22  removed the matter to this Court.  Plaintiffs allege claims under 42 U.S.C. § 1983, as well as

23  state law claims for negligence, assault and battery, intentional infliction of emotional distress,

24  and wrongful death against the City of Mendota ("Mendota") and the County of Fresno ("the

25  County").[1]  Mendota and the County now move for summary judgement on all claims alleged

26  against them.  For the reasons that follow, the motion for summary judgment will be granted in

27  part, and this case will be remanded to the Fresno County Superior Court.

28        _____

    [1] Plaintiff also alleges 5 products liability theories against West Coast Ammunitions.  However, the motion
    before the Court does not involve West Coast Ammunitions, and is brought solely by Mendota and the County.

1

**BACKGROUND**[2]

2      During the evening of November 6, 2008, County Sheriff Deputies Kenneth Kalar

3   ("Kalar"), Josh Hamilton ("Hamilton"), and Jeff Shipman ("Shipman") were dispatched to 610

4   Gaxiola in the city of Mendota, California in response to a call reporting two men fighting.

5   DUMF 1; PUMF 10.  When the deputies arrived at 610 Gaxiola, a neighbor, Ruth Ann Alvarez

6   ("Alvarez"), translated information between Spanish speaking individuals at the scene and the

7   deputies.  DUMF 2.  The deputies spoke to witnesses and were told that Angel had been involved

8   in a fight with another male and had just left on foot.  DUMF 3.[3]  Deputies were also told that

9   Angel had beaten a pregnant female, which caused two of the deputies to leave 610 Gaxiola in

10   order to canvass the area for Angel.  See id.

11      The deputies were unsuccessful in locating Angel, so they returned to 610 Gaxiola.  The

12   deputies were informed that a phone call was received indicating that Angel was at his home at

13   325 Blanco Street and was beating his pregnant wife.  See DUMF 4.  Alvarez told the deputies

14   what was said during that phone call.  See id.

15      Hamilton and Shipman drove their patrol cars to 325 Blanco.  DUMF 6.  Kalar stayed

16   behind for a moment and attempted to get more information from the witnesses, but then

17   followed the other deputies to that location.  See id.

18      The deputies arrived at 325 Blanco within seconds, and Hamilton and Shipman noticed

19   broken glass in the driveway and that the rear windows of a van in the driveway were broken out.

20   DUMF 7.  Shipman also saw a trail of blood leading up to the front door and that there was blood

21   smeared on the stucco exterior of a pillar outside the front door.  DUMF 8.

22      The deputies approached the front door, which was open, rang the door bell, and entered

23   the premises.  See Diaz Depo. 22:12-18; DUMF 9.  The officers then encountered a female, who

24   was later identified as Maria Leticia Ramos Diaz ("Diaz").  See DUMF 9.  Diaz told the deputies

25   _____

26   [2]"DUMF" refers to "Defendants' Undisputed Material Fact" and "PUMF" refers to "Plaintiffs' Undisputed
Material Fact."

27   [3]Plaintiffs object that statements by Alvarez, as well as statements made by Leticia Diaz, are hearsay.
Defendants argue that the statements are offered to show the totality of the circumstances confronting the deputies.
28   The Court will view statements by Alvarez and Diaz as only being offered to show what the Defendants were told as
part of the totality of the circumstances, and not for the truth of the matter asserted.

1   that Angel was drunk inside.  See id.  Upon entering the living room, Hamilton noticed a

2   television pushed through an entertainment center and it appeared to him that some sort of

3   disturbance had occurred there.  DUMF 10.  Diaz told Hamilton that Angel had caused the mess.

4   See id.[4]  Diaz told the deputies that Angel was in the back of the house and then took them down

5   the hallway and pointed to the room that he was in.  DUMF 12; Hamilton Dec. ¶ 11.

6        Shipman and Hamilton approached the door that Diaz directed them to.  DUMF 13.  The

7   deputies noticed some blood smeared on the hallway wall.  See Shipman Dec. ¶ 10; Hamilton

8   Dec. ¶ 12.  Hamilton asked Diaz to leave the hallway, and then noticed a small puddle of blood

9   in an open laundry room next to the bedroom.  See Hamilton Dec. ¶ 13; DUMF 14.  Shipman

10  checked the door and it was locked, and both deputies could hear the sound of yelling and objects

11  hitting the walls inside the room.  DUMF 13.[5]

12       Hamilton considered what force options were available to them and determined that OC

13  spray would not be an option due to the size of the hallway and the number of persons present

14  who may be contaminated by the OC spray.  DUMF 15.  Hamilton also determined that the due

15  to the size of the hallway that a baton would not be an option.  Id.  The last two options available

16  would be going hands on with a violent subject or using a less lethal shotgun.  Id.  Hamilton

17  determined that the safest option would be the less lethal shotgun.  Id.  County Sheriff's deputies

18  were not equipped with tasers on November 26, 2008.  DUMF 17.  Hamilton asked Shipman if

19  Shipman had a less lethal shotgun.  DUMF 18.  Shipman replied that he had a less lethal shotgun

20  in his car and went to retrieve it.  See id.

21       The deputies knocked on the door and demanded that Angel come out in both English

22  and Spanish.  See PUMF 17; Diaz Depo. 24:1-9.  Angel opened the door and took three steps out

23  of the door way.  See Diaz Depo. 27:9-28:11.  The deputies noticed blood coming from Angel's

24

25       [4]Plaintiffs cite two pages of Diaz's deposition and state that those excerpts do not include testimony that she
    told the officers that Angel was the reason for the mess.  However, the two pages do not purport to be the complete
26  reconstruction of Diaz's conversations.  Further, as Defendants point out, Diaz testified that Angel threw the
    television.  See Diaz Depo. 10:6-18.

27       [5]Plaintiffs state that Blanca Castro ("Castro") testified that there was no yelling.  However, Blanca was not
    present when the deputies declare that they heard the noises in Angel's room.  See Blanca Depo. 34:3-11.  Also,
28  Diaz testified that she did not hear yelling or items being thrown in Angel's room, but in context, Diaz's testimony
    relates to the time prior to the deputies' arrival.  See Diaz Depo. 16:3-17:4.

1    nose and mouth area, and believed that he appeared to be intoxicated and angry.  DUMF 20.

2    Hamilton ordered Angel to raise his hands.  See Hamilton Dec. ¶¶ 22-23.

3         There is a significant dispute between the parties as to the next sequence of events.  Cf.

4    DUMF's 21-28 with PUMF's 22-29 & Plaintiffs' Responses to DUMF's 21-28.  Defendants

5    contend that the right side of Angel's body was obscured, they could not see his right hand, and

6    they did not know if he had a weapon.  Angel responded to the officers' orders by yelling "Fuck

7    you, come and get me."  Angel made a forward movement toward the deputies and Hamilton

8    ordered Shipman to fire the bean bag shotgun.[6]  Shipman aimed at Angel's hip area and fired the

9    shot gun.  In contrast, Plaintiffs contend that Angel's whole body was visible to the deputies.

10   Angel did not say "Fuck you, come and get me," but instead asked "why" in Spanish.  Angel

11   started to raise his hands and thereafter Shipman fired the shotgun.[7]

12        Shipman was 15 to 16 feet away when he fired the shotgun.  See DUMF 28;[8] O'Callahan

13   Ex. F ("Williams Report") at 11:9-10; Fox Dec. ¶ 5 & Ex. A.  County deputies are trained that

14   the optimal distance for the bean bag shotgun is between 5 and 20 yards, which is the factory

15   recommended range.  See DUMF 29; see also Williams Report 9:4-5 (acknowledging that 5 to

16   20 yards is the "optimum distance" for deployment).  The bean bag round hit Angel in the chest.

17   See Shipman Dec. ¶ 14.  Angel fell face first into the hallway and made a noise.  See PUMF 32;

18   Diaz Depo. 49:12-17.  The deputies radioed for a supervisor and for EMS, ran to Angel,

19   handcuffed him, and determined that Angel had no weapons.  See DUMF's 31, 32.  Kalar

20   noticed that Angel was having trouble breathing, so he monitored Angel's vitals and radioed for

21

22   [6]Hamilton had earlier ordered Shipman to fire the bean bag shotgun, but Shipman did not fire because he
     could not get proper placement for the bean bag round.  DUMF 25.  The deputies had not located any pregnant
23   woman at the scene and were concerned that she might be in need of medical attention.  DUMF's 16, 24.

24   [7]Diaz's deposition indicates that Angel's hands may have been raised by the time the bean bag gun was
     fired.  See Diaz Depo. 30:9-18.

25   [8]Plaintiffs' state they dispute that Shipman was 15 to 16 feet away.  Plaintiffs rely on the deposition
     testimony of Castro, Diaz, and Maria Mendoza.  However, as Defendants rightly point out, Mendoza's testimony
26   deals with how far away she was after the shooting, Diaz's testimony only indicates how far behind the officers she
     was standing, and Castro's testimony merely discusses Shipman aiming at Angel and not the distance away.  See
27   Castro Depo. 27, 36, 69; Diaz Depo. 24, 26, 41; and Mendoza Depo. 90.  PUMF 27 states that Shipman was within
     5 yards of Angel, but the evidence cited are deposition excerpts from Diaz.  Those excerpts deal with Diaz marking a
28   photograph in order to depict the positions of Angel and the officers.  See Diaz Depo. 25, 26, 40, 41, 45 & Ex. E.
     Diaz never states what the distance was between Shipman and Angel.  See id.  Thus, DUMF 28 is undisputed.

1    EMS to respond Code 3.  See DUMF 33.  EMS arrived approximately 5 minutes after the bean

2    bag struck Angel.  See DUMF 34.  Angel was transported to the hospital, but ultimately died.

3         The Commission on Peace Officer Standards and Training ("POST") is the governing

4    body that sets the standards for training peace officers in California.  DUMF 35.  The Fresno

5    County Sheriff's Office provides deputies with training, including training in legal force and less

6    lethal applications, comporting with POST requirements and industry standards.  DUMF 36.  All

7    peace officers in California, including County deputies, must obtain a basic certificate from

8    POST and complete yearly training as set forth by POST in order to continue to exercise peace

9    officer authority.  See DUMF 37.  POST continually audits training records of the Fresno County

10   Sheriff's Office to ensure that the training provided to the deputies complies with POST

11   standards.  See DUMF 38.[9]  All deputies employed by the Fresno County Sheriff's Office are in

12   compliance with POST requirements, and the same was true in November 26, 2008.  DUMF

13   39.[10]  The policies and procedures of the Fresno County Sheriff's Office with respect to

14   supervision and discipline of deputies, obtaining medical assistance, and the use of force meet

15   industry standards.  See DUMF Nos. 40, 41, 42.[11]

16        Plaintiffs have not disclosed or pursued any evidence relating to the customs, policies or

17   practices of Mendota.  See Velasco Dec. ¶ 5.  Plaintiffs did not disclose to defense counsel any

18   evidence of prior constitutional violations by the County with regard to uses of force or with

19   regard to any inadequate training of County deputies.  See id. at ¶ 4.  Plaintiffs have propounded

20   one set of interrogatories, one set of requests for production, have not taken depositions, and

21   have not pursued any evidence relating to customs, policies or practices of the County.  See

22   Velasco Dec. ¶ 3.

23   _____

24   [9]Plaintiffs object that there is a dispute over the adequacy of the training.  However, that does not dispute
     that POST audits the Sheriff's Office training records.  DUMF 38 is undisputed.

25   [10]Plaintiffs object that their expert witness opined that the deputies used excessive force.  However, this
     does not dispute the fact that the deputies obtained the required POST certificates and training.  Cf. Merritt v.
26   County of Los Angeles, 875 F.2d 765, 770 (9th Cir. 1989) (single incident of errant behavior is insufficient basis for
     holding a municipality liable for inadequate training).
27

28   [11]Plaintiffs object in part that the officers used excessive force.  However, that excessive force may have
     been used in this instance does not alone show an improper practice, custom, or policy.  See Trevino v. Gates, 99
     F.3d 911, 918 (9th Cir. 1995); Merritt, 875 F.2d at 770.

5

1                                    **SUMMARY JUDGMENT FRAMEWORK**

2           Summary judgment is appropriate when it is demonstrated that there exists no genuine

3    issue as to any material fact, and that the moving party is entitled to judgment as a matter of law.

4    Fed. R. Civ. P. 56; Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970); Fortyune v.

5    American Multi-Cinema, Inc., 364 F.3d 1075, 1080 (9th Cir. 2004).  The party seeking summary

6    judgment bears the initial burden of informing the court of the basis for its motion and of

7    identifying the portions of the declarations (if any), pleadings, and  discovery that demonstrate an

8    absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986);

9    Soremekun v. Thrifty Payless, Inc., 509 F.3d 978, 984 (9th Cir. 2007).  A fact is "material" if it

10   might affect the outcome of the suit under the governing law.  See Anderson v. Liberty Lobby,

11   Inc., 477 U.S. 242, 248-49 (1986); United States v. Kapp, 564 F.3d 1103, 1114 (9th Cir. 2009).

12   A dispute is "genuine" as to a material fact if there is sufficient evidence for a reasonable jury to

13   return a verdict for the non-moving party.  Anderson, 477 U.S. at 248; Freecycle Sunnyvale v.

14   Freecycle Network, 626 F.3d 509, 514 (9th Cir. 2010).

15          Where the moving party will have the burden of proof on an issue at trial, the movant

16   must affirmatively demonstrate that no reasonable trier of fact could find other than for the

17   movant.  Soremekun, 509 F.3d at 984.  Where the non-moving party will have the burden of

18   proof on an issue at trial, the movant may prevail by presenting evidence that negates an essential

19   element of the non-moving party's claim or by merely pointing out that there is an absence of

20   evidence to support an essential element of the non-moving party's claim.  See James River Ins.

21   Co. v. Schenk, P.C., 519 F.3d 917, 925 (9th Cir. 2008); Soremekun, 509 F.3d at 984.  If a

22   moving party fails to carry its burden of production, then "the non-moving party has no

23   obligation to produce anything, even if the non-moving party would have the ultimate burden of

24   persuasion."  Nissan Fire & Marine Ins. Co. v. Fritz Cos., 210 F.3d 1099, 1105-06 (9th Cir.

25   2000) If the moving party meets its initial burden, the burden then shifts to the opposing party to

26   establish that a genuine issue as to any material fact actually exists.  See Matsushita Elec. Indus.

27   Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986); Nissan Fire, 210 F.3d at 1103.  The

28   opposing party cannot "'rest upon the mere allegations or denials of [its] pleading' but must

1  instead produce evidence that 'sets forth specific facts showing that there is a genuine issue for

2  trial.'"  Estate of Tucker v. Interscope Records, 515 F.3d 1019, 1030 (9th Cir. 2008).

3       The opposing party's evidence is to be believed, and all justifiable inferences that may be

4  drawn from the facts placed before the court must be drawn in favor of the opposing party.  See

5  Anderson, 477 U.S. at 255; Narayan v. EGL, Inc., 616 F.3d 895, 899 (9th Cir. 2010).  While a

6  "justifiable inference" need not be the most likely or the most persuasive inference, a "justifiable

7  inference" must be rational or reasonable.  See Narayan, 616 F.3d at 899.  Inferences are not

8  drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from

9  which the inference may be drawn.  See Sanders v. City of Fresno, 551 F.Supp.2d 1149, 1163

10  (E.D. Cal. 2008); UMG Recordings, Inc. v. Sinnott, 300 F.Supp.2d 993, 997 (E.D. Cal. 2004).

11  "A genuine issue of material fact does not spring into being simply because a litigant claims that

12  one exists or promises to produce admissible evidence at trial."  Del Carmen Guadalupe v.

13  Agosto, 299 F.3d 15, 23 (1st Cir. 2002); see Bryant v. Adventist Health System/West, 289 F.3d

14  1162, 1167 (9th Cir. 2002).  Further, a "motion for summary judgment may not be defeated . . .

15  by evidence that is 'merely colorable' or 'is not significantly probative.'"  Anderson, 477 U.S. at

16  249-50; Hardage v. CBS Broad. Inc., 427 F.3d 1177, 1183 (9th Cir. 2006).  If the nonmoving

17  party fails to produce evidence sufficient to create a genuine issue of material fact, the moving

18  party is entitled to summary judgment.  Nissan Fire, 210 F.3d at 1103.

19       Finally, the court has the discretion in appropriate circumstances to consider materials

20  that are not properly brought to its attention, but the court is not required to comb through the

21  entire file for evidence establishing a genuine issue of material fact where the evidence is not set

22  forth in the opposing papers with adequate references.  See Simmons v. Navajo County, 609 F.3d

23  1011, 1017 (9th Cir. 2010); Gordon v. Virtumundo, Inc., 575 F.3d 1040, 1058 (9th Cir. 2009).

24

25                          **DEFENDANTS' MOTION**

26      **I.**        **First, Second, & Third Causes of Action – 42 U.S.C. § 1983**

27      *Defendants' Argument*

28      Defendants argue that Plaintiffs have no evidence of a custom, policy or practice for

1    purposes of *Monell* liability, and the undisputed facts show that the County's policies are

2    constitutional and comport with industry standards.  Defendants also argue that there is no

3    evidence that the County provides inadequate training to its deputies.  The undisputed evidence

4    shows that the provided training, both at the time of the subject incident and thereafter, complies

5    with POST.

6          *Plaintiffs' Opposition*

7          Plaintiffs argue that, since 2007, there have been multiple claims of excessive force

8    against the County Sheriff's Department.  The multiple claims show that the use of excessive

9    force was a widespread practice that amounted to a force of law.  Despite these multiple claims,

10    Defendants have not offered any evidence of additional training or steps taken to cure the

11    problem of excessive force.  The multiple claims should have alerted Defendants to the need for

12    additional training.  Further, Defendants admit that they were not equipped with tasers, or other

13    less lethal safeguards that would have been suitable for the situation.  At the time of the subject

14    incident, it was industry standard to be equipped with tasers, yet Defendants failed to comply

15    with this standard.  The absence of additional training and the failure to equip deputies with

16    tasers is a failure to properly equip the deputies with the tools necessary to avoid excessive force.

17          *Legal Standard*

18          Municipalities are considered "persons" under 42 U.S.C. § 1983 and therefore may be

19    liable for causing a constitutional deprivation.  Monell v. Department of Soc. Servs., 436 U.S.

20    658, 690 (1978); Long v. County of Los Angeles, 442 F.3d 1178, 1185 (9th Cir. 2006).  A

21    municipality, however, "cannot be held liable solely because it employs a tortfeasor – or, in other

22    words, a municipality cannot be held liable under [42 U.S.C. § 1983] under a *respondeat*

23    *superior* theory."  Monell, 436 U.S. at 691; see Long, 442 F.3d at 1185; Ulrich v. City & County

24    of San Francisco, 308 F.3d 968, 984 (9th Cir. 2002).  When a plaintiff alleges that a municipality

25    failed to act to preserve constitutional rights, the plaintiff must show: (1) the deprivation of a

26    constitutional right; (2) that the municipality had a policy or custom; (3) the policy or custom

27    amounts to deliberate indifference to the plaintiff's constitutional right; and (4) the policy or

28    custom is the moving force behind the constitutional violation.  See Van Ort v. Estate of

1   Stanewich, 92 F.3d 831, 835 (9th Cir. 1998); Gibson v. County of Washoe, 290 F.3d 1175, 1185-

2   86 (9th Cir. 2002); see also Biberdorf v. Oregon, 243 F.Supp.2d 1145, 1155 (D. Or. 2007).

3   Deliberate indifference is a stringent standard of fault.  Bryan County v. Brown, 520 U.S. 397,

4   410 (1997); Patel v. Kent Sch. Dist., 648 F.3d 965, 974 (9th Cir. 2011).  A municipality is

5   "deliberately indifferent" when the need for more or different action, "is so obvious, and the

6   inadequacy [of the current procedure] so likely to result in the violation of constitutional rights,

7   that the policymakers … can reasonably be said to have been deliberately indifferent to the

8   need." City of Canton v. Harris, 489 U.S. 378, 391 (1989); Lee v. City of Los Angeles, 250 F.3d

9   668, 681 (9th Cir. 2001).  A policy or custom is a moving force if the policy or custom was both

10   the cause in fact and the proximate cause of the constitutional deprivation.  See Harper v. City of

11   Los Angeles, 533 F.3d 1010, 1026 (9th Cir. 2008); Trevino, 99 F.3d at 918.

12          As explained, liability only attaches where the municipality itself causes the constitutional

13   violation through "execution of a government's policy or custom, whether made by its

14   lawmakers or by those whose edicts or acts may fairly be said to represent official policy."

15   Monell, 436 U.S. at 694; Ulrich, 308 F.3d at 984.  Municipal liability may be premised on: (1)

16   conduct pursuant to an expressly adopted official policy; (2) a longstanding practice or custom

17   which constitutes the 'standard operating procedure' of the local government entity; (3) a

18   decision of a decision-making official who was, as a matter of state law, a final policymaking

19   authority whose edicts or acts may fairly be said to represent official policy in the area of

20   decision; or (4) an official with final policymaking authority either delegating that authority to, or

21   ratifying the decision of, a subordinate.  See Price v. Sery, 513 F.3d 962, 966 (9th Cir. Or. 2008);

22   Lytle v. Carl, 382 F.3d 978, 982 (9th Cir. 2004); Ulrich, 308 F.3d at 984-85; Trevino v. Gates, 99

23   F.3d 911, 918 (9th Cir. 1995).  A "policy" is a deliberate choice to follow a course of action . . .

24   made from among various alternatives by the official or officials responsible for establishing

25   final policy with respect to the subject matter in question." Fogel v. Collins, 531 F.3d 824, 834

26   (9th Cir. 2008); Long, 442 F.3d at 1185.  A "custom" for purposes of municipal liability is a

27   widespread practice that, although not authorized by written law or express municipal policy, is

28   so permanent and well-settled as to constitute a custom or usage with the force of law." St. Louis

1  v. Praprotnik, 485 U.S. 112, 127 (1988); Los Angeles Police Protective League v. Gates, 907

2  F.2d 879, 890 (9th Cir. 1990); see also Bouman v. Block, 940 F.2d 1211, 231-32 (9th Cir. 1991).

3   "Liability for improper custom may not be predicated on isolated or sporadic incidents; it must

4  be founded upon practices of sufficient duration, frequency and consistency that the conduct has

5  become a traditional method of carrying out policy." Trevino, 99 F.3d at 918; see also McDade

6  v. West, 223 F.3d 1135, 1141 (9th Cir. 2000); Thompson v. Los Angeles, 885 F.2d 1439, 1443-

7  44 (9th Cir. 1989).

8          A municipality's failure to train its employees may create § 1983 liability where the

9  "failure to train amounts to deliberate indifference to the rights of persons with whom the

10  [employees] come into contact." City of Canton, 489 U.S. at 388; Long, 442 F.3d at 1186; Lee,

11  250 F.3d at 681.  "The issue is whether the training program is adequate and, if it is not, whether

12  such inadequate training can justifiably be said to represent municipal policy." Long, 442 F.3d at

13  1186.  A plaintiff alleging a failure to train claim must show:  (1) he was deprived of a

14  constitutional right, (2) the municipality had a training policy that "amounts to deliberate

15  indifference to the [constitutional] rights of the persons' with whom [its police officers] are likely

16  to come into contact;" and (3) his constitutional injury would have been avoided had the

17  municipality properly trained those officers. Blankenhorn v. City of Orange, 485 F.3d 463, 484

18  (9th Cir. 2007); Lee, 250 F.3d at 681.  A "pattern of tortious conduct," despite the existence of a

19  training program, or "highly predictable" constitutional violations due to a "failure to equip law

20  enforcement officers with specific tools to handle recurring situations," are circumstances in

21  which liability for failure to train may be imposed. See Brown, 520 U.S. at 407-10; Long, 442

22  F.3d at 1186-87.  However, "adequately trained officers occasionally make mistakes; the fact that

23  they do says little about the training program or the legal basis for holding the [municipality]

24  liable." City of Canton, 489 U.S. at 391.  "Mere proof of a single incident of errant behavior is a

25  clearly insufficient basis for imposing liability on the County." Merritt v. County of Los

26  Angeles, 875 F.2d 765, 770 (9th Cir. 1989); see also McDade, 223 F.3d at 1141.

27          *Discussion*

28          Plaintiffs appear to be relying on three bases for *Monell* liability: (1) a pattern of

1   tolerating excessive force; (2) a failure to provide additional training; and (3) a failure to equip

2   deputies with tasers.  For each of these theories, Plaintiffs rely heavily on the declaration of their

3   police procedures expert, Ronnie Williams.  There are problems with Plaintiffs' arguments.

        1.      Discovery Objection

5        Defendants have objected that the key opinions in Williams's declaration are outside the

6   scope of Plaintiffs' Rule 26 disclosures.  The Court construed this objection as Williams

7   improperly making opinions in his declaration that were not disclosed in his expert report as

8   required by Rule 26(a)(2)(B)(i).  See Doc. No. 111.  The Court issued an order for Plaintiffs to

9   respond to the Rule 26 objection with respect to PUMF's 31, 35, and 36, and DUMF's 38, 39,

10  40, and 41.[12]  Id.  The Court expressly informed Plaintiffs that the Court viewed Defendants'

11  objections as being made pursuant to Rule 26(a)(2)(B)(i) and stated that Rule 37(c)(1) was

12  implicated.  Id.  Plaintiffs timely filed a response as per the Court order.  Plaintiffs did not

13  respond to the objections regarding the DUMF's, but did respond to the objections regarding the

14  PUMF's.

15       PUMF 35 reads, "At the time of the incident, it was industry standard to be equipped with

16  tasers."  Plaintiffs respond to the objection by stating first, Williams is a qualified expert.  See

17  Doc. No. 112.  Second, Williams's report details why the deputies' actions were unreasonable

18  and provides for alternatives that could have been used, including tasers.  The PUMF is not

19  outside the scope of the disclosure, but further explains the basis of his belief.  Third, Williams

20  reviewed and discussed the conduct of the deputies, and he clearly meant to establish that it was

21  industry standard at the time to be armed with tasers.

22       PUMF 36 reads in pertinent part, "At the time of the incident, the sheriffs department had

23  developed a custom of using excessive force."  In response to Defendants' objections, Plaintiffs

24  responded in pertinent part, "Williams's expert report clearly discusses the unreasonable force

25  that the sheriffs' deputies used.  The word 'custom' here refers to the effect training and

26  instruction received by the members of the department."  Doc. No. 112.

27

28       [12]The objections with respect to the DUMF's are objections made by Defendants in their reply to Plaintiffs'
opposition to the DUMF's.

1    Under Rule 26(a)(2), a retained expert must submit a written report and that report "must

2  contain:  a complete statement of all opinions the witness will express and the basis and reason

3  for them." Fed. R. Civ. Pro. 26(a)(2)(B)(i).  Relatedly, Rule 37(c) provides a mechanism for

4  dealing with a failure to follow Rule 26(a).  In pertinent part, Rule 37(c) reads: "If a party fails to

5  provide information . . . as required by Rule 26(a) or (e), the party is not allowed to use that

6  information . . . to supply evidence on a motion, at a hearing, or at trial, unless the failure was

7  substantially justified or is harmless."  Fed. R. Civ. Pro. 37(c)(1).  The burden is on the party

8  facing sanctions to prove substantial justification or harmlessness.  Yeti by Molly, Ltd. v.

9  Deckers Outdoor Corp., 259 F.3d 1101, 1107 (9th Cir. 2001).

10    Here, Defendants' objection is well taken.  Essentially, Plaintiffs attempt to argue that the

11  opinions in Williams's declaration are within the expert report because Williams discussed the

12  reasonableness of the deputies conduct.  Plaintiffs argument is unpersuasive and meritless.

13    The opinions contained in Williams's Rule 26 expert report are generally limited to the

14  conduct of officers Hamilton, Shipman, and Kalar.  There are no opinions regarding the policies,

15  practices, or customs of Mendota or the County.  Of particular importance, there are no opinions

16  in the expert report regarding any other incidents, lawsuits, or complaints of excessive force

17  against these entities, there are no opinions that discuss any training methods or any training

18  deficiencies by Defendants, there are no opinions expressed that in any way mention or deal with

19  tasers (the word taser is not even used in the report), and there are no opinions about taser

20  training or industry standards with respect to equipping officers with tasers.  See Williams

21  Report.  The expert report requirement of Rule 26 is meant to provide the parties with an

22  understanding of each of the expert opinions, including the bases for those opinions, that will be

23  leveled against them.  If Williams intended to opine about the customs, policies, and practices of

24  Defendants, then he should have clearly and expressly disclosed those opinions as required by

25  Rule 26(a)(2)(B)(i).  Searching within the shadows of the report for opinions that were never

26  expressed will not do.

27    Further, relying on opinions about the reasonableness of the deputies' conduct at this

28  single occurrence, including times during the occurrence when the deputies' conduct may not

1  have comported with training or proper police practices, is unavailing.  It is well established that,

2  absent an express policy or ratification, a single isolated incident by non-policy making officers

3  cannot establish *Monell* liability.  See City of Canton, 489 U.S. at 391 ("adequately trained

4  officers occasionally make mistakes; the fact that they do says little about the training program or

5  the legal basis for holding the [municipality] liable"); McDade, 223 F.3d at 1141; Trevino, 99

6  F.3d at 918; Merritt, 875 F.2d at 770.  Williams' opinions about the reasonableness of the

7  individual deputies' conduct neither encompasses *Monell* liability nor places Defendants on

8  notice that Williams will be offering *Monell* opinions.

9       Finally, Plaintiffs' have not met their burden of establishing either substantial justification

10 or harmlessness.  In fact, they have not attempted to do so even though the Court cited to Rule

11 37(c)(1) in its order.  See Doc. No. 111.  Discovery has closed, and expert discovery was

12 extended at Plaintiffs' request.  The pre-trial conference is scheduled for October 3, 2012, and

13 trial in this matter is set for November 2012.  Defense counsel's declaration shows that, despite

14 the completion of discovery, Plaintiffs did not pursue their *Monell* claims.  See Velasco Dec. ¶¶

15 2-5.  No depositions were taken, only one set of interrogatories and one request for production

16 were served, and it does not appear that the policies, practices, or customs of Mendota or the

17 County were the subject of the paper discovery.  See id.  Under these circumstances, the Court

18 will enforce Rule 37(c)(1) and exclude the opinions of Plaintiffs' expert Ronnie Williams with

19 respect to the policies, practices, and customs of Defendants, and in particular the opinions that

20 form the bases of PUMF's 35 and 36 and Plaintiffs' objections to DUMF's 38, 39, 40, and 41.

21 See Fed. R. Civ. Pro. 37(c)(1); Yeti by Molly, 259 F.3d at 1107.

22       Without Williams's opinions, there is no evidence that a policy, practice, or custom of

23 Mendota or the County caused Plaintiffs a constitutional injury.  Summary judgment is proper.

24               2.      Substance of Williams's Declaration

25       Alternatively, even if the Court does not exclude the relevant portions of Williams's

26 declaration, Plaintiffs have not met their burden of creating a genuine, material, disputed fact.

27 Williams's declaration at the very best "is 'merely colorable' or 'is not significantly probative'"

28 evidence.  Anderson, 477 U.S. at 249-50; Hardage, 427 F.3d at 1183.

1    First, with respect to a pattern of tolerating excessive force, the pertinent evidence is from

2    Paragraph 5 of Williams's declaration.  That paragraph reads:

3        The past several years Fresno County and the Fresno County Sheriff's Department
         have had numerous lawsuits filed against them regarding the use of unnecessary

4        force/excessive force.  While this not uncommon in large law enforcement
         agencies, it should be a concern that is constantly monitored.  Since 2007, there

5        have been approximately twenty lawsuits alleging excessive force, with the
         possible cost in the millions of dollars.  This does not include the numerous

6        complaints alleging excessive force.

7    Williams Dec. ¶ 5.  This paragraph is insufficient to create a triable issue of material fact.

8    The period from 2007 to August 2012 covers nearly six calendar years.  Counting 2012 as

9    a full calendar year, a total of 20 cases filed averages to just over 3 cases per year.  Williams

10   acknowledges that numerous lawsuits against large law enforcement agencies are not uncommon,

11   but he does not actually opine that the just over 3 cases per year is abnormally high for a law

12   enforcement agency the size of the Fresno County Sheriff's Department.  It is unclear to the

13   Court whether 3 to 4 cases per year for an agency the size of the Fresno County Sheriff's

14   Department would be considered excessive.  Further, there is no description provided by

15   Williams of any of the 20 cases.  No facts as to any of the 20 cases are given, so it cannot be

16   determined whether any of these cases are similar and relevant to this case.  Also, there is no

17   evidence provided as to how any of the 20 cases were resolved, or if any were in fact resolved

18   due to a finding of excessive force.  Without further evidence, it is possible that each of these 20

19   cases were finally resolved based on a judicial finding of no excessive force.  The mere fact that a

20   lawsuit was filed does not in and of itself show that excessive force is tolerated, encouraged, or

21   has become a de facto policy.  Finally, Williams is a retired Los Angeles sheriff's deputy who

22   signed his declaration in Los Angeles.  There is no indication that Williams has any knowledge

23   regarding how many complaints of excessive force were filed with the Fresno County Sheriff's

24   Department, or knows how any of those complaints were resolved.  Williams's opinion at

25   Paragraph 5 is simply too general, speculative, and infirm.[13]

26   _____

27   [13] Plaintiffs' opposition cites Paragraph 5 of Williams' declaration and then argues that the multiple claims
     "indicated that the use of excessive force was a widespread practice that amounted to a force of law."  Opposition at

28   8:12-14.  However, Paragraph 5 is quoted above in its entirety.  Paragraph 5 does not actually state that the number
     of lawsuits is excessive, and it certainly does not state that there is a widespread practice of excessive force based on
     the 20 lawsuits.

1    Second, Plaintiffs' argument regarding the failure to provide additional training is based

2    on Williams' opinion at Paragraph 5 and on an assertion that the County has provided no

3    evidence that additional training has been provided.  However, as stated above, Paragraph 5 does

4    not create a genuine disputed issue and does not discuss the County's training policies.  Also,

5    given the nature of the motion before the Court, the absence of evidence concerning additional

6    training is not persuasive since Defendants were not required to submit such evidence.

7    Defendants have submitted evidence that shows compliance with POST training standards,

8    declared that Plaintiffs did not pursue evidence of a custom, practice, or policy by Defendants,

9    and expressly asserted that Plaintiffs cannot show *Monell* liability.  This is sufficient to meet

10   Defendants' initial summary judgment burden.  See Soremekun, 509 F.3d at 984.  To the extent

11   that Plaintiffs may be asserting that additional training actually did not occur despite the 20

12   lawsuits, such an assertion is not supported by citation to any evidence and thus, cannot create a

13   genuine issue of disputed material fact.  See Angel v. Seattle-First Nat'l Bank, 653 F.2d 1293,

14   1299 (9th Cir. 1982); British Airways Bd. v. Boeing Co., 585 F.2d 946, 951-52 (9th Cir. 1978).

15       Third, Plaintiffs argue that the County Sheriff's Department was not equipped with tasers,

16   which is evidence of a deliberately indifferent policy of tolerating excessive force and not

17   equipping officers with proper tools.  Plaintiffs rely on Williams' declaration and on PUMF 38.

18   Williams declared in pertinent part:

19       Most law enforcement agencies have Pepper Spray, Tasers, and Stun Bag
         Shotguns as part of their less lethal weaponry, along with guidelines for their use.
20       Tasers are being used by approximately 11,500 law enforcement agencies, with
         approximately 260,000 devices deployed.  They have been used by law
21       enforcement agencies for at least the past decade.

22       It is inconceivable that a law enforcement agency in today's environment would
         have Pepper Spray, Stun Bag Shotgun, and not have the Taser in their armory.
23       The use of the Taser by law enforcement agencies all over the United States has
         saved lives . . . .
24
         In 2011, there are news reports of the Fresno County Sheriff's Department
25       deploying the taser in the field and on or about November 12, 2008, they deployed
         pepper ball rounds, bean bag rounds, and a taser against a man who lunged at
26       deputies with a knife and pruning shears.
             . . . .
27
         In my opinion, the Fresno County Sheriff's Department either deployed the Taser
28       in 2008, or they should have because you want the force you use to appear
         objectively reasonable to the communities you serve.  To deploy the Stun Bag

15

1

2

> shotgun, which is an impact weapon, that can cause severe trauma, and not have available the Taser, which is less traumatic, is inconceivable.

3

Williams' Dec. ¶¶ 6-10.  Similarly, PUMF 38 reads: "At the time of the incident, [the County]

4

was not equipped with tasers."  PUMF 38 relies in part on the declaration Kalar.  Kalar makes

5

one reference to tasers:  "The hallway we were in was too confined for us to use O.C. spray or a

6

baton and we were not equipped with Tasers at the time of this incident."  Kalar Dec. ¶ 14.

7

Captain Steve Wilkins has declared that County Sheriff deputies are currently equipped with

8

tasers, but on November 26, 2008, they were not.  See Wilkins Dec. ¶ 3.  Wilkins also declares

9

that the officer who deployed the taser in November 2008, as identified in the press release, was

10

in fact an officer from the Kerman Police Department and not a County deputy.  See id. at ¶ 2.

11

Considering this evidence and the arguments, the failure to equip the deputies with a taser does

12

not raise a triable issue.

13

The deputies in this case had O.C./pepper spray, a baton, the bean bag shotgun, and

14

physical force (tackling, wrestling, and compliance holds) available to them.  See DUMF 15.

15

Bean-bag shotguns are considered "less lethal" force options, see Glenn v. Washington County,

16

673 F.3d 864, 871 (9th Cir. 2011), and batons and pepper spray are considered non-lethal force

17

options.  See Bryan v. MacPherson, 630 F.3d 805, 825 (9th Cir. 2009).  Thus, aside from service

18

firearms, the County equipped these deputies with three non-lethal force options and one less

19

than lethal force option.  Because of the County's training and equipment, the officers had four

20

options available to them other than the lethal force firearm.  Providing this equipment, and

21

ensuring that the officers were trained in compliance with POST standards, reflects a decision by

22

the County to provide force options that are more likely to not result in fatal encounters between

23

deputies and the public.  Without more, the provision of these four force options, but just not a

24

taser, does not meet the stringent "deliberate indifference" standard required for *Monell* liability.

25

Further, Plaintiffs cite no cases that have held that *Monell* liability is possible based on

26

the failure of an entity to equip officers with a particular type of non-lethal force option, let alone

27

any cases where officers had four other "non-firearm" force options available to them.  The Court

28

itself has not found authority that supports Plaintiffs' position. The absence of any on-point

1    authority is telling, and harmful to Plaintiffs' case.[14]

2         Finally, the basis of Williams's opinion regarding taser deployment is that "you want the

3    force you use to appear objectively reasonable to the communities you serve."  A local

4    community's possible perception is not the standard for imposing *Monell* liability.  The County

5    equipped the officers with four other force options, which does not reflect deliberate indifference.

6    There is no indication that the County did not follow POST training guidelines, nor is there

7    evidence that the failure to provide deputies with tasers in November 2008 violated POST or

8    statutory requirements.

9         In sum, Williams's declaration fails to raise a genuine issue of disputed material fact with

10   respect to a policy, practice, or custom of Mendota or the County that caused Plaintiffs a

11   constitutional harm.  Summary judgment in favor of Defendants is appropriate.

12

13   **II.      State Law Claims**

14        Defendants also request summary judgment on Plaintiffs' state law claims.  However,

15   because the Court will grant summary judgment to Defendants on the federal causes of action,

16   there are no longer any federal claims left in this case.  Jurisdiction in this case is based on the

17   presence of a federal question, and the Court has supplemental jurisdiction over the state law

18   claims pursuant to 28 U.S.C. § 1367.  Under 28 U.S.C. § 1367(c)(3), a district court may decline

19   to exercise jurisdiction over supplemental state law claims if "the district court has dismissed all

20   claims over which it has original jurisdiction."  Generally, "when federal claims are dismissed

21   before trial . . . pendent state claims should also be dismissed."  Religious Tech. Ctr v.

22   Wollersheim, 971 F.2d 364, 367-68 (9th Cir. 1992).  When removal is based on the presence of a

23   federal cause of action, a district court may remand pendent or supplemental state law claims to

24   the state court once the federal claims have been eliminated.  See Lee v. City of Beaumont, 12

25   F.3d 933, 937 (9th Cir. 1993).  In fact, "it is generally preferable for a district court to remand

26   _____

27       [14]Plaintiffs do not cite *Brown*, but, as quoted above, that case does discuss liability for a failure to "equip"
    officers with "specific tools to handle recurring situations."  See Brown, 520 U.S. at 409-10.  That statement was
    made in the context of training officers; it refers to ensuring that officers are trained how to react in recurring
28   situations.  See id.  Further, it does not appear "highly predictable" that not arming deputies with tasers, but arming
    them with other non-lethal or less lethal equipment, will result in more cases of excessive force.  See id.

1  remaining pendent claims to state court." Id.

2        Here, considering judicial economy, convenience, fairness, and comity, and because

3  summary judgment has been granted on all of Plaintiffs' federal claims, the Court will decline to

4  exercise supplemental jurisdiction over the remaining state law claims. See Carnegie-Mellon

5  Univ. v. Cohill, 484 U.S. 343, 350 n.7 (1988); City of Colton v. Am. Promotional Events,

6  Inc.-West, 614 F.3d 998, 1008 (9th Cir. 2010) ("Because the district court did not err in granting

7  summary judgment on the federal claims, it did not abuse its discretion in dismissing the

8  state-law claims."); Lee, 12 F.3d at 937; Religious Tech., 971 F.2d at 367-68. Issues of

9  compliance with the California Claims Act are best left for the Superior Courts. Further,

10 Plaintiffs are alleging a negligence cause of action based on the officer's conduct. The Ninth

11 Circuit certified a related negligence question to the California Supreme Court. See Hayes v.

12 County of San Diego, 658 F.3d 867 (9th Cir. 2011). The California Supreme Court accepted the

13 question, and the issue is awaiting a decision by the California Supreme Court. See Hayes v.

14 County of San Diego, 2011 Cal. LEXIS 8139 (Aug. 10, 2011). It is better for the Superior Court

15 to handle this currently unsettled state law negligence issue under these circumstances. Cf. 28

16 U.S.C. § 1367(c)(1).

17

18                                      **CONCLUSION**

19       Defendants move for summary judgment on the claims against them.

20       With respect to the federal causes of action, summary judgment is appropriate because

21 exclusion of the pertinent opinions by Williams in his declaration is proper under Rule 37(c)(1).

22 Without the opinions in Williams's declaration, there is no evidence to support *Monell* liability.

23 Alternatively, the substance of Williams's *Monell* related opinions are insufficient to show that a

24 constitutional injury was suffered as a result of a deliberately indifferent policy, practice, or

25 custom.

26       With respect to the state law claims, the Court declines to exercise supplemental

27 jurisdiction pursuant to 28 U.S.C. § 1367(c)(3). Instead, the Court will remand the remaining

28 state law claims to the Fresno County Superior Court.

**ORDER**

Accordingly, IT IS HEREBY ORDERED that:

1. Summary judgment in favor of Defendants on Plaintiffs's First, Second, and Third Causes of Action is GRANTED;

2. The Court declines to exercise supplemental jurisdiction over the remaining state law claims;

3. All currently set dates and deadlines, including the trial and pre-trial conference, are VACATED; and

4. This case is REMANDED forthwith to the Fresno County Superior Court.


IT IS SO ORDERED.


Dated:     September 25, 2012     

                                                CHIEF UNITED STATES DISTRICT JUDGE

19