IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANGIE MELISSA CASTRO, by her guardian ad litem Blanco Estela Castro, individually and as successor in interest to ANGEL ANTONIO MENDOZA SARAVIA, BLANCA ESTELA CASTRO, TERESA REYNA MENDOZA-SARAVIA, and PEDRO MENDOZA,<br><br>Plaintiffs,<br>v.<br><br>CITY OF MENDOTA, COUNTY OF FRESNO, WEST COAST AMMUNITIONS, and DOES 1 through 100, inclusive,<br><br>Defendants. | 1:10-cv-618 AWI BAM<br><br>ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND ORDER REMANDING CASE TO STATE COURT |

This case stems from the death of Angel Antonio Mendoza Saravia ("Angel") during an encounter with deputies from the Fresno County Sheriff's Office. Plaintiffs are Angel's family members. Plaintiffs originally filed suit in the Fresno County Superior Court, but the Defendants removed the matter to this Court. Plaintiffs allege claims under 42 U.S.C. § 1983, as well as state law claims for negligence, assault and battery, intentional infliction of emotional distress, and wrongful death against the City of Mendota ("Mendota") and the County of Fresno ("the County").[1] Mendota and the County now move for summary judgement on all claims alleged against them. For the reasons that follow, the motion for summary judgment will be granted in part, and this case will be remanded to the Fresno County Superior Court.

---

[1] Plaintiff also alleges 5 products liability theories against West Coast Ammunitions. However, the motion before the Court does not involve West Coast Ammunitions, and is brought solely by Mendota and the County.

**BACKGROUND**[2]

During the evening of November 6, 2008, County Sheriff Deputies Kenneth Kalar ("Kalar"), Josh Hamilton ("Hamilton"), and Jeff Shipman ("Shipman") were dispatched to 610 Gaxiola in the city of Mendota, California in response to a call reporting two men fighting. DUMF 1; PUMF 10.  When the deputies arrived at 610 Gaxiola, a neighbor, Ruth Ann Alvarez ("Alvarez"), translated information between Spanish speaking individuals at the scene and the deputies.  DUMF 2.  The deputies spoke to witnesses and were told that Angel had been involved in a fight with another male and had just left on foot.  DUMF 3.[3]  Deputies were also told that Angel had beaten a pregnant female, which caused two of the deputies to leave 610 Gaxiola in order to canvass the area for Angel.  See id.

The deputies were unsuccessful in locating Angel, so they returned to 610 Gaxiola.  The deputies were informed that a phone call was received indicating that Angel was at his home at 325 Blanco Street and was beating his pregnant wife.  See DUMF 4.  Alvarez told the deputies what was said during that phone call.  See id.

Hamilton and Shipman drove their patrol cars to 325 Blanco.  DUMF 6.  Kalar stayed behind for a moment and attempted to get more information from the witnesses, but then followed the other deputies to that location.  See id.

The deputies arrived at 325 Blanco within seconds, and Hamilton and Shipman noticed broken glass in the driveway and that the rear windows of a van in the driveway were broken out. DUMF 7.  Shipman also saw a trail of blood leading up to the front door and that there was blood smeared on the stucco exterior of a pillar outside the front door.  DUMF 8.

The deputies approached the front door, which was open, rang the door bell, and entered the premises.  See Diaz Depo. 22:12-18; DUMF 9.  The officers then encountered a female, who was later identified as Maria Leticia Ramos Diaz ("Diaz").  See DUMF 9.  Diaz told the deputies

---

[2] "DUMF" refers to "Defendants' Undisputed Material Fact" and "PUMF" refers to "Plaintiffs' Undisputed Material Fact."

[3] Plaintiffs object that statements by Alvarez, as well as statements made by Leticia Diaz, are hearsay. Defendants argue that the statements are offered to show the totality of the circumstances confronting the deputies. The Court will view statements by Alvarez and Diaz as only being offered to show what the Defendants were told as part of the totality of the circumstances, and not for the truth of the matter asserted.

that Angel was drunk inside. See id. Upon entering the living room, Hamilton noticed a television pushed through an entertainment center and it appeared to him that some sort of disturbance had occurred there. DUMF 10. Diaz told Hamilton that Angel had caused the mess. See id.[4] Diaz told the deputies that Angel was in the back of the house and then took them down the hallway and pointed to the room that he was in. DUMF 12; Hamilton Dec. ¶ 11.

Shipman and Hamilton approached the door that Diaz directed them to. DUMF 13. The deputies noticed some blood smeared on the hallway wall. See Shipman Dec. ¶ 10; Hamilton Dec. ¶ 12. Hamilton asked Diaz to leave the hallway, and then noticed a small puddle of blood in an open laundry room next to the bedroom. See Hamilton Dec. ¶ 13; DUMF 14. Shipman checked the door and it was locked, and both deputies could hear the sound of yelling and objects hitting the walls inside the room. DUMF 13.[5]

Hamilton considered what force options were available to them and determined that OC spray would not be an option due to the size of the hallway and the number of persons present who may be contaminated by the OC spray. DUMF 15. Hamilton also determined that the due to the size of the hallway that a baton would not be an option. Id. The last two options available would be going hands on with a violent subject or using a less lethal shotgun. Id. Hamilton determined that the safest option would be the less lethal shotgun. Id. County Sheriff's deputies were not equipped with tasers on November 26, 2008. DUMF 17. Hamilton asked Shipman if Shipman had a less lethal shotgun. DUMF 18. Shipman replied that he had a less lethal shotgun in his car and went to retrieve it. See id.

The deputies knocked on the door and demanded that Angel come out in both English and Spanish. See PUMF 17; Diaz Depo. 24:1-9. Angel opened the door and took three steps out of the door way. See Diaz Depo. 27:9-28:11. The deputies noticed blood coming from Angel's

---

[4] Plaintiffs cite two pages of Diaz's deposition and state that those excerpts do not include testimony that she told the officers that Angel was the reason for the mess. However, the two pages do not purport to be the complete reconstruction of Diaz's conversations. Further, as Defendants point out, Diaz testified that Angel threw the television. See Diaz Depo. 10:6-18.

[5] Plaintiffs state that Blanca Castro ("Castro") testified that there was no yelling. However, Blanca was not present when the deputies declare that they heard the noises in Angel's room. See Blanca Depo. 34:3-11. Also, Diaz testified that she did not hear yelling or items being thrown in Angel's room, but in context, Diaz's testimony relates to the time prior to the deputies' arrival. See Diaz Depo. 16:3-17:4.

nose and mouth area, and believed that he appeared to be intoxicated and angry. DUMF 20. Hamilton ordered Angel to raise his hands. See Hamilton Dec. ¶¶ 22-23.

There is a significant dispute between the parties as to the next sequence of events. Cf. DUMF's 21-28 with PUMF's 22-29 & Plaintiffs' Responses to DUMF's 21-28. Defendants contend that the right side of Angel's body was obscured, they could not see his right hand, and they did not know if he had a weapon. Angel responded to the officers' orders by yelling "Fuck you, come and get me." Angel made a forward movement toward the deputies and Hamilton ordered Shipman to fire the bean bag shotgun.[6] Shipman aimed at Angel's hip area and fired the shot gun. In contrast, Plaintiffs contend that Angel's whole body was visible to the deputies. Angel did not say "Fuck you, come and get me," but instead asked "why" in Spanish. Angel started to raise his hands and thereafter Shipman fired the shotgun.[7]

Shipman was 15 to 16 feet away when he fired the shotgun. See DUMF 28;[8] O'Callahan Ex. F ("Williams Report") at 11:9-10; Fox Dec. ¶ 5 & Ex. A. County deputies are trained that the optimal distance for the bean bag shotgun is between 5 and 20 yards, which is the factory recommended range. See DUMF 29; see also Williams Report 9:4-5 (acknowledging that 5 to 20 yards is the "optimum distance" for deployment). The bean bag round hit Angel in the chest. See Shipman Dec. ¶ 14. Angel fell face first into the hallway and made a noise. See PUMF 32; Diaz Depo. 49:12-17. The deputies radioed for a supervisor and for EMS, ran to Angel, handcuffed him, and determined that Angel had no weapons. See DUMF's 31, 32. Kalar noticed that Angel was having trouble breathing, so he monitored Angel's vitals and radioed for

---

[6] Hamilton had earlier ordered Shipman to fire the bean bag shotgun, but Shipman did not fire because he could not get proper placement for the bean bag round. DUMF 25. The deputies had not located any pregnant woman at the scene and were concerned that she might be in need of medical attention. DUMF's 16, 24.

[7] Diaz's deposition indicates that Angel's hands may have been raised by the time the bean bag gun was fired. See Diaz Depo. 30:9-18.

[8] Plaintiffs' state they dispute that Shipman was 15 to 16 feet away. Plaintiffs rely on the deposition testimony of Castro, Diaz, and Maria Mendoza. However, as Defendants rightly point out, Mendoza's testimony deals with how far away she was after the shooting, Diaz's testimony only indicates how far behind the officers she was standing, and Castro's testimony merely discusses Shipman aiming at Angel and not the distance away. See Castro Depo. 27, 36, 69; Diaz Depo. 24, 26, 41; and Mendoza Depo. 90. PUMF 27 states that Shipman was within 5 yards of Angel, but the evidence cited are deposition excerpts from Diaz. Those excerpts deal with Diaz marking a photograph in order to depict the positions of Angel and the officers. See Diaz Depo. 25, 26, 40, 41, 45 & Ex. E. Diaz never states what the distance was between Shipman and Angel. See id. Thus, DUMF 28 is undisputed.

4

EMS to respond Code 3.  See DUMF 33.  EMS arrived approximately 5 minutes after the bean bag struck Angel.  See DUMF 34.  Angel was transported to the hospital, but ultimately died.

The Commission on Peace Officer Standards and Training ("POST") is the governing body that sets the standards for training peace officers in California.  DUMF 35.  The Fresno County Sheriff's Office provides deputies with training, including training in legal force and less lethal applications, comporting with POST requirements and industry standards.  DUMF 36.  All peace officers in California, including County deputies, must obtain a basic certificate from POST and complete yearly training as set forth by POST in order to continue to exercise peace officer authority.  See DUMF 37.  POST continually audits training records of the Fresno County Sheriff's Office to ensure that the training provided to the deputies complies with POST standards.  See DUMF 38.[9]  All deputies employed by the Fresno County Sheriff's Office are in compliance with POST requirements, and the same was true in November 26, 2008.  DUMF 39.[10]  The policies and procedures of the Fresno County Sheriff's Office with respect to supervision and discipline of deputies, obtaining medical assistance, and the use of force meet industry standards.  See DUMF Nos. 40, 41, 42.[11]

Plaintiffs have not disclosed or pursued any evidence relating to the customs, policies or practices of Mendota.  See Velasco Dec. ¶ 5.  Plaintiffs did not disclose to defense counsel any evidence of prior constitutional violations by the County with regard to uses of force or with regard to any inadequate training of County deputies.  See id. at ¶ 4.  Plaintiffs have propounded one set of interrogatories, one set of requests for production, have not taken depositions, and have not pursued any evidence relating to customs, policies or practices of the County.  See Velasco Dec. ¶ 3.

---

[9] Plaintiffs object that there is a dispute over the adequacy of the training.  However, that does not dispute that POST audits the Sheriff's Office training records.  DUMF 38 is undisputed.

[10] Plaintiffs object that their expert witness opined that the deputies used excessive force.  However, this does not dispute the fact that the deputies obtained the required POST certificates and training.  Cf. Merritt v. County of Los Angeles, 875 F.2d 765, 770 (9th Cir. 1989) (single incident of errant behavior is insufficient basis for holding a municipality liable for inadequate training).

[11] Plaintiffs object in part that the officers used excessive force.  However, that excessive force may have been used in this instance does not alone show an improper practice, custom, or policy.  See Trevino v. Gates, 99 F.3d 911, 918 (9th Cir. 1995); Merritt, 875 F.2d at 770.

5

**SUMMARY JUDGMENT FRAMEWORK**

Summary judgment is appropriate when it is demonstrated that there exists no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970); Fortyune v. American Multi-Cinema, Inc., 364 F.3d 1075, 1080 (9th Cir. 2004). The party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and of identifying the portions of the declarations (if any), pleadings, and discovery that demonstrate an absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Soremekun v. Thrifty Payless, Inc., 509 F.3d 978, 984 (9th Cir. 2007). A fact is "material" if it might affect the outcome of the suit under the governing law. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49 (1986); United States v. Kapp, 564 F.3d 1103, 1114 (9th Cir. 2009). A dispute is "genuine" as to a material fact if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party. Anderson, 477 U.S. at 248; Freecycle Sunnyvale v. Freecycle Network, 626 F.3d 509, 514 (9th Cir. 2010).

Where the moving party will have the burden of proof on an issue at trial, the movant must affirmatively demonstrate that no reasonable trier of fact could find other than for the movant. Soremekun, 509 F.3d at 984. Where the non-moving party will have the burden of proof on an issue at trial, the movant may prevail by presenting evidence that negates an essential element of the non-moving party's claim or by merely pointing out that there is an absence of evidence to support an essential element of the non-moving party's claim. See James River Ins. Co. v. Schenk, P.C., 519 F.3d 917, 925 (9th Cir. 2008); Soremekun, 509 F.3d at 984. If a moving party fails to carry its burden of production, then "the non-moving party has no obligation to produce anything, even if the non-moving party would have the ultimate burden of persuasion." Nissan Fire & Marine Ins. Co. v. Fritz Cos., 210 F.3d 1099, 1105-06 (9th Cir. 2000) If the moving party meets its initial burden, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually exists. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986); Nissan Fire, 210 F.3d at 1103. The opposing party cannot "'rest upon the mere allegations or denials of [its] pleading' but must

instead produce evidence that 'sets forth specific facts showing that there is a genuine issue for trial.'" Estate of Tucker v. Interscope Records, 515 F.3d 1019, 1030 (9th Cir. 2008).

The opposing party's evidence is to be believed, and all justifiable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party. See Anderson, 477 U.S. at 255; Narayan v. EGL, Inc., 616 F.3d 895, 899 (9th Cir. 2010). While a "justifiable inference" need not be the most likely or the most persuasive inference, a "justifiable inference" must be rational or reasonable. See Narayan, 616 F.3d at 899. Inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. See Sanders v. City of Fresno, 551 F.Supp.2d 1149, 1163 (E.D. Cal. 2008); UMG Recordings, Inc. v. Sinnott, 300 F.Supp.2d 993, 997 (E.D. Cal. 2004). "A genuine issue of material fact does not spring into being simply because a litigant claims that one exists or promises to produce admissible evidence at trial." Del Carmen Guadalupe v. Agosto, 299 F.3d 15, 23 (1st Cir. 2002); see Bryant v. Adventist Health System/West, 289 F.3d 1162, 1167 (9th Cir. 2002). Further, a "motion for summary judgment may not be defeated . . . by evidence that is 'merely colorable' or 'is not significantly probative.'" Anderson, 477 U.S. at 249-50; Hardage v. CBS Broad. Inc., 427 F.3d 1177, 1183 (9th Cir. 2006). If the nonmoving party fails to produce evidence sufficient to create a genuine issue of material fact, the moving party is entitled to summary judgment. Nissan Fire, 210 F.3d at 1103.

Finally, the court has the discretion in appropriate circumstances to consider materials that are not properly brought to its attention, but the court is not required to comb through the entire file for evidence establishing a genuine issue of material fact where the evidence is not set forth in the opposing papers with adequate references. See Simmons v. Navajo County, 609 F.3d 1011, 1017 (9th Cir. 2010); Gordon v. Virtumundo, Inc., 575 F.3d 1040, 1058 (9th Cir. 2009).

**DEFENDANTS' MOTION**

**I.    First, Second, & Third Causes of Action – 42 U.S.C. § 1983**

*Defendants' Argument*

Defendants argue that Plaintiffs have no evidence of a custom, policy or practice for

purposes of *Monell* liability, and the undisputed facts show that the County's policies are constitutional and comport with industry standards. Defendants also argue that there is no evidence that the County provides inadequate training to its deputies. The undisputed evidence shows that the provided training, both at the time of the subject incident and thereafter, complies with POST.

*Plaintiffs' Opposition*

Plaintiffs argue that, since 2007, there have been multiple claims of excessive force against the County Sheriff's Department. The multiple claims show that the use of excessive force was a widespread practice that amounted to a force of law. Despite these multiple claims, Defendants have not offered any evidence of additional training or steps taken to cure the problem of excessive force. The multiple claims should have alerted Defendants to the need for additional training. Further, Defendants admit that they were not equipped with tasers, or other less lethal safeguards that would have been suitable for the situation. At the time of the subject incident, it was industry standard to be equipped with tasers, yet Defendants failed to comply with this standard. The absence of additional training and the failure to equip deputies with tasers is a failure to properly equip the deputies with the tools necessary to avoid excessive force.

*Legal Standard*

Municipalities are considered "persons" under 42 U.S.C. § 1983 and therefore may be liable for causing a constitutional deprivation. Monell v. Department of Soc. Servs., 436 U.S. 658, 690 (1978); Long v. County of Los Angeles, 442 F.3d 1178, 1185 (9th Cir. 2006). A municipality, however, "cannot be held liable solely because it employs a tortfeasor – or, in other words, a municipality cannot be held liable under [42 U.S.C. § 1983] under a *respondeat superior* theory." Monell, 436 U.S. at 691; see Long, 442 F.3d at 1185; Ulrich v. City & County of San Francisco, 308 F.3d 968, 984 (9th Cir. 2002). When a plaintiff alleges that a municipality failed to act to preserve constitutional rights, the plaintiff must show: (1) the deprivation of a constitutional right; (2) that the municipality had a policy or custom; (3) the policy or custom amounts to deliberate indifference to the plaintiff's constitutional right; and (4) the policy or custom is the moving force behind the constitutional violation. See Van Ort v. Estate of

Stanewich, 92 F.3d 831, 835 (9th Cir. 1998); Gibson v. County of Washoe, 290 F.3d 1175, 1185-86 (9th Cir. 2002); see also Biberdorf v. Oregon, 243 F.Supp.2d 1145, 1155 (D. Or. 2007). Deliberate indifference is a stringent standard of fault. Bryan County v. Brown, 520 U.S. 397, 410 (1997); Patel v. Kent Sch. Dist., 648 F.3d 965, 974 (9th Cir. 2011). A municipality is "deliberately indifferent" when the need for more or different action, "is so obvious, and the inadequacy [of the current procedure] so likely to result in the violation of constitutional rights, that the policymakers … can reasonably be said to have been deliberately indifferent to the need." City of Canton v. Harris, 489 U.S. 378, 391 (1989); Lee v. City of Los Angeles, 250 F.3d 668, 681 (9th Cir. 2001). A policy or custom is a moving force if the policy or custom was both the cause in fact and the proximate cause of the constitutional deprivation. See Harper v. City of Los Angeles, 533 F.3d 1010, 1026 (9th Cir. 2008); Trevino, 99 F.3d at 918.

As explained, liability only attaches where the municipality itself causes the constitutional violation through "execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy." Monell, 436 U.S. at 694; Ulrich, 308 F.3d at 984. Municipal liability may be premised on: (1) conduct pursuant to an expressly adopted official policy; (2) a longstanding practice or custom which constitutes the 'standard operating procedure' of the local government entity; (3) a decision of a decision-making official who was, as a matter of state law, a final policymaking authority whose edicts or acts may fairly be said to represent official policy in the area of decision; or (4) an official with final policymaking authority either delegating that authority to, or ratifying the decision of, a subordinate. See Price v. Sery, 513 F.3d 962, 966 (9th Cir. Or. 2008); Lytle v. Carl, 382 F.3d 978, 982 (9th Cir. 2004); Ulrich, 308 F.3d at 984-85; Trevino v. Gates, 99 F.3d 911, 918 (9th Cir. 1995). A "policy" is a deliberate choice to follow a course of action . . . made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." Fogel v. Collins, 531 F.3d 824, 834 (9th Cir. 2008); Long, 442 F.3d at 1185. A "custom" for purposes of municipal liability is a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well-settled as to constitute a custom or usage with the force of law." St. Louis

v. Praprotnik, 485 U.S. 112, 127 (1988); Los Angeles Police Protective League v. Gates, 907 F.2d 879, 890 (9th Cir. 1990); see also Bouman v. Block, 940 F.2d 1211, 231-32 (9th Cir. 1991). "Liability for improper custom may not be predicated on isolated or sporadic incidents; it must be founded upon practices of sufficient duration, frequency and consistency that the conduct has become a traditional method of carrying out policy." Trevino, 99 F.3d at 918; see also McDade v. West, 223 F.3d 1135, 1141 (9th Cir. 2000); Thompson v. Los Angeles, 885 F.2d 1439, 1443-44 (9th Cir. 1989).

A municipality's failure to train its employees may create § 1983 liability where the "failure to train amounts to deliberate indifference to the rights of persons with whom the [employees] come into contact." City of Canton, 489 U.S. at 388; Long, 442 F.3d at 1186; Lee, 250 F.3d at 681. "The issue is whether the training program is adequate and, if it is not, whether such inadequate training can justifiably be said to represent municipal policy." Long, 442 F.3d at 1186. A plaintiff alleging a failure to train claim must show: (1) he was deprived of a constitutional right, (2) the municipality had a training policy that "amounts to deliberate indifference to the [constitutional] rights of the persons' with whom [its police officers] are likely to come into contact;" and (3) his constitutional injury would have been avoided had the municipality properly trained those officers. Blankenhorn v. City of Orange, 485 F.3d 463, 484 (9th Cir. 2007); Lee, 250 F.3d at 681. A "pattern of tortious conduct," despite the existence of a training program, or "highly predictable" constitutional violations due to a "failure to equip law enforcement officers with specific tools to handle recurring situations," are circumstances in which liability for failure to train may be imposed. See Brown, 520 U.S. at 407-10; Long, 442 F.3d at 1186-87. However, "adequately trained officers occasionally make mistakes; the fact that they do says little about the training program or the legal basis for holding the [municipality] liable." City of Canton, 489 U.S. at 391. "Mere proof of a single incident of errant behavior is a clearly insufficient basis for imposing liability on the County." Merritt v. County of Los Angeles, 875 F.2d 765, 770 (9th Cir. 1989); see also McDade, 223 F.3d at 1141.

*Discussion*

Plaintiffs appear to be relying on three bases for *Monell* liability: (1) a pattern of

tolerating excessive force; (2) a failure to provide additional training; and (3) a failure to equip deputies with tasers.  For each of these theories, Plaintiffs rely heavily on the declaration of their police procedures expert, Ronnie Williams.  There are problems with Plaintiffs' arguments.

### 1. Discovery Objection

Defendants have objected that the key opinions in Williams's declaration are outside the scope of Plaintiffs' Rule 26 disclosures.  The Court construed this objection as Williams improperly making opinions in his declaration that were not disclosed in his expert report as required by Rule 26(a)(2)(B)(i).  See Doc. No. 111.  The Court issued an order for Plaintiffs to respond to the Rule 26 objection with respect to PUMF's 31, 35, and 36, and DUMF's 38, 39, 40, and 41.[12]  Id.  The Court expressly informed Plaintiffs that the Court viewed Defendants' objections as being made pursuant to Rule 26(a)(2)(B)(i) and stated that Rule 37(c)(1) was implicated.  Id.  Plaintiffs timely filed a response as per the Court order.  Plaintiffs did not respond to the objections regarding the DUMF's, but did respond to the objections regarding the PUMF's.

PUMF 35 reads, "At the time of the incident, it was industry standard to be equipped with tasers."  Plaintiffs respond to the objection by stating first, Williams is a qualified expert.  See Doc. No. 112.  Second, Williams's report details why the deputies' actions were unreasonable and provides for alternatives that could have been used, including tasers.  The PUMF is not outside the scope of the disclosure, but further explains the basis of his belief.  Third, Williams reviewed and discussed the conduct of the deputies, and he clearly meant to establish that it was industry standard at the time to be armed with tasers.

PUMF 36 reads in pertinent part, "At the time of the incident, the sheriffs department had developed a custom of using excessive force."  In response to Defendants' objections, Plaintiffs responded in pertinent part, "Williams's expert report clearly discusses the unreasonable force that the sheriffs' deputies used.  The word 'custom' here refers to the effect training and instruction received by the members of the department."  Doc. No. 112.

---

[12] The objections with respect to the DUMF's are objections made by Defendants in their reply to Plaintiffs' opposition to the DUMF's.

Under Rule 26(a)(2), a retained expert must submit a written report and that report "must contain: a complete statement of all opinions the witness will express and the basis and reason for them." Fed. R. Civ. Pro. 26(a)(2)(B)(i).  Relatedly, Rule 37(c) provides a mechanism for dealing with a failure to follow Rule 26(a).  In pertinent part, Rule 37(c) reads: "If a party fails to provide information . . . as required by Rule 26(a) or (e), the party is not allowed to use that information . . . to supply evidence on a motion, at a hearing, or at trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. Pro. 37(c)(1).  The burden is on the party facing sanctions to prove substantial justification or harmlessness.  Yeti by Molly, Ltd. v. Deckers Outdoor Corp., 259 F.3d 1101, 1107 (9th Cir. 2001).

Here, Defendants' objection is well taken.  Essentially, Plaintiffs attempt to argue that the opinions in Williams's declaration are within the expert report because Williams discussed the reasonableness of the deputies conduct.  Plaintiffs argument is unpersuasive and meritless.

The opinions contained in Williams's Rule 26 expert report are generally limited to the conduct of officers Hamilton, Shipman, and Kalar.  There are no opinions regarding the policies, practices, or customs of Mendota or the County.  Of particular importance, there are no opinions in the expert report regarding any other incidents, lawsuits, or complaints of excessive force against these entities, there are no opinions that discuss any training methods or any training deficiencies by Defendants, there are no opinions expressed that in any way mention or deal with tasers (the word taser is not even used in the report), and there are no opinions about taser training or industry standards with respect to equipping officers with tasers.  See Williams Report.  The expert report requirement of Rule 26 is meant to provide the parties with an understanding of each of the expert opinions, including the bases for those opinions, that will be leveled against them.  If Williams intended to opine about the customs, policies, and practices of Defendants, then he should have clearly and expressly disclosed those opinions as required by Rule 26(a)(2)(B)(i).  Searching within the shadows of the report for opinions that were never expressed will not do.

Further, relying on opinions about the reasonableness of the deputies' conduct at this single occurrence, including times during the occurrence when the deputies' conduct may not

have comported with training or proper police practices, is unavailing. It is well established that, absent an express policy or ratification, a single isolated incident by non-policy making officers cannot establish *Monell* liability. See City of Canton, 489 U.S. at 391 ("adequately trained officers occasionally make mistakes; the fact that they do says little about the training program or the legal basis for holding the [municipality] liable"); McDade, 223 F.3d at 1141; Trevino, 99 F.3d at 918; Merritt, 875 F.2d at 770. Williams' opinions about the reasonableness of the individual deputies' conduct neither encompasses *Monell* liability nor places Defendants on notice that Williams will be offering *Monell* opinions.

Finally, Plaintiffs' have not met their burden of establishing either substantial justification or harmlessness. In fact, they have not attempted to do so even though the Court cited to Rule 37(c)(1) in its order. See Doc. No. 111. Discovery has closed, and expert discovery was extended at Plaintiffs' request. The pre-trial conference is scheduled for October 3, 2012, and trial in this matter is set for November 2012. Defense counsel's declaration shows that, despite the completion of discovery, Plaintiffs did not pursue their *Monell* claims. See Velasco Dec. ¶¶ 2-5. No depositions were taken, only one set of interrogatories and one request for production were served, and it does not appear that the policies, practices, or customs of Mendota or the County were the subject of the paper discovery. See id. Under these circumstances, the Court will enforce Rule 37(c)(1) and exclude the opinions of Plaintiffs' expert Ronnie Williams with respect to the policies, practices, and customs of Defendants, and in particular the opinions that form the bases of PUMF's 35 and 36 and Plaintiffs' objections to DUMF's 38, 39, 40, and 41. See Fed. R. Civ. Pro. 37(c)(1); Yeti by Molly, 259 F.3d at 1107.

Without Williams's opinions, there is no evidence that a policy, practice, or custom of Mendota or the County caused Plaintiffs a constitutional injury. Summary judgment is proper.

        2.     Substance of Williams's Declaration

Alternatively, even if the Court does not exclude the relevant portions of Williams's declaration, Plaintiffs have not met their burden of creating a genuine, material, disputed fact. Williams's declaration at the very best "is 'merely colorable' or 'is not significantly probative'" evidence. Anderson, 477 U.S. at 249-50; Hardage, 427 F.3d at 1183.

First, with respect to a pattern of tolerating excessive force, the pertinent evidence is from Paragraph 5 of Williams's declaration. That paragraph reads:

> The past several years Fresno County and the Fresno County Sheriff's Department have had numerous lawsuits filed against them regarding the use of unnecessary force/excessive force. While this not uncommon in large law enforcement agencies, it should be a concern that is constantly monitored. Since 2007, there have been approximately twenty lawsuits alleging excessive force, with the possible cost in the millions of dollars. This does not include the numerous complaints alleging excessive force.

Williams Dec. ¶ 5. This paragraph is insufficient to create a triable issue of material fact.

The period from 2007 to August 2012 covers nearly six calendar years. Counting 2012 as a full calendar year, a total of 20 cases filed averages to just over 3 cases per year. Williams acknowledges that numerous lawsuits against large law enforcement agencies are not uncommon, but he does not actually opine that the just over 3 cases per year is abnormally high for a law enforcement agency the size of the Fresno County Sheriff's Department. It is unclear to the Court whether 3 to 4 cases per year for an agency the size of the Fresno County Sheriff's Department would be considered excessive. Further, there is no description provided by Williams of any of the 20 cases. No facts as to any of the 20 cases are given, so it cannot be determined whether any of these cases are similar and relevant to this case. Also, there is no evidence provided as to how any of the 20 cases were resolved, or if any were in fact resolved due to a finding of excessive force. Without further evidence, it is possible that each of these 20 cases were finally resolved based on a judicial finding of no excessive force. The mere fact that a lawsuit was filed does not in and of itself show that excessive force is tolerated, encouraged, or has become a de facto policy. Finally, Williams is a retired Los Angeles sheriff's deputy who signed his declaration in Los Angeles. There is no indication that Williams has any knowledge regarding how many complaints of excessive force were filed with the Fresno County Sheriff's Department, or knows how any of those complaints were resolved. Williams's opinion at Paragraph 5 is simply too general, speculative, and infirm.[13]

---

[13] Plaintiffs' opposition cites Paragraph 5 of Williams' declaration and then argues that the multiple claims "indicated that the use of excessive force was a widespread practice that amounted to a force of law." Opposition at 8:12-14. However, Paragraph 5 is quoted above in its entirety. Paragraph 5 does not actually state that the number of lawsuits is excessive, and it certainly does not state that there is a widespread practice of excessive force based on the 20 lawsuits.

14

Second, Plaintiffs' argument regarding the failure to provide additional training is based on Williams' opinion at Paragraph 5 and on an assertion that the County has provided no evidence that additional training has been provided. However, as stated above, Paragraph 5 does not create a genuine disputed issue and does not discuss the County's training policies. Also, given the nature of the motion before the Court, the absence of evidence concerning additional training is not persuasive since Defendants were not required to submit such evidence. Defendants have submitted evidence that shows compliance with POST training standards, declared that Plaintiffs did not pursue evidence of a custom, practice, or policy by Defendants, and expressly asserted that Plaintiffs cannot show *Monell* liability. This is sufficient to meet Defendants' initial summary judgment burden. See Soremekun, 509 F.3d at 984. To the extent that Plaintiffs may be asserting that additional training actually did not occur despite the 20 lawsuits, such an assertion is not supported by citation to any evidence and thus, cannot create a genuine issue of disputed material fact. See Angel v. Seattle-First Nat'l Bank, 653 F.2d 1293, 1299 (9th Cir. 1982); British Airways Bd. v. Boeing Co., 585 F.2d 946, 951-52 (9th Cir. 1978).

Third, Plaintiffs argue that the County Sheriff's Department was not equipped with tasers, which is evidence of a deliberately indifferent policy of tolerating excessive force and not equipping officers with proper tools. Plaintiffs rely on Williams' declaration and on PUMF 38. Williams declared in pertinent part:

> Most law enforcement agencies have Pepper Spray, Tasers, and Stun Bag Shotguns as part of their less lethal weaponry, along with guidelines for their use. Tasers are being used by approximately 11,500 law enforcement agencies, with approximately 260,000 devices deployed. They have been used by law enforcement agencies for at least the past decade.
>
> It is inconceivable that a law enforcement agency in today's environment would have Pepper Spray, Stun Bag Shotgun, and not have the Taser in their armory. The use of the Taser by law enforcement agencies all over the United States has saved lives . . . .
>
> In 2011, there are news reports of the Fresno County Sheriff's Department deploying the taser in the field and on or about November 12, 2008, they deployed pepper ball rounds, bean bag rounds, and a taser against a man who lunged at deputies with a knife and pruning shears.
>           . . . .
> In my opinion, the Fresno County Sheriff's Department either deployed the Taser in 2008, or they should have because you want the force you use to appear objectively reasonable to the communities you serve. To deploy the Stun Bag

>shotgun, which is an impact weapon, that can cause severe trauma, and not have available the Taser, which is less traumatic, is inconceivable.

Williams' Dec. ¶¶ 6-10.  Similarly, PUMF 38 reads: "At the time of the incident, [the County] was not equipped with tasers."  PUMF 38 relies in part on the declaration Kalar.  Kalar makes one reference to tasers:  "The hallway we were in was too confined for us to use O.C. spray or a baton and we were not equipped with Tasers at the time of this incident."  Kalar Dec. ¶ 14.  Captain Steve Wilkins has declared that County Sheriff deputies are currently equipped with tasers, but on November 26, 2008, they were not.  See Wilkins Dec. ¶ 3.  Wilkins also declares that the officer who deployed the taser in November 2008, as identified in the press release, was in fact an officer from the Kerman Police Department and not a County deputy.  See id. at ¶ 2.  Considering this evidence and the arguments, the failure to equip the deputies with a taser does not raise a triable issue.

The deputies in this case had O.C./pepper spray, a baton, the bean bag shotgun, and physical force (tackling, wrestling, and compliance holds) available to them.  See DUMF 15.  Bean-bag shotguns are considered "less lethal" force options, see Glenn v. Washington County, 673 F.3d 864, 871 (9th Cir. 2011), and batons and pepper spray are considered non-lethal force options.  See Bryan v. MacPherson, 630 F.3d 805, 825 (9th Cir. 2009).  Thus, aside from service firearms, the County equipped these deputies with three non-lethal force options and one less than lethal force option.  Because of the County's training and equipment, the officers had four options available to them other than the lethal force firearm.  Providing this equipment, and ensuring that the officers were trained in compliance with POST standards, reflects a decision by the County to provide force options that are more likely to not result in fatal encounters between deputies and the public.  Without more, the provision of these four force options, but just not a taser, does not meet the stringent "deliberate indifference" standard required for *Monell* liability.

Further, Plaintiffs cite no cases that have held that *Monell* liability is possible based on the failure of an entity to equip officers with a particular type of non-lethal force option, let alone any cases where officers had four other "non-firearm" force options available to them.  The Court itself has not found authority that supports Plaintiffs' position. The absence of any on-point

16

authority is telling, and harmful to Plaintiffs' case.[14]

Finally, the basis of Williams's opinion regarding taser deployment is that "you want the force you use to appear objectively reasonable to the communities you serve." A local community's possible perception is not the standard for imposing *Monell* liability. The County equipped the officers with four other force options, which does not reflect deliberate indifference. There is no indication that the County did not follow POST training guidelines, nor is there evidence that the failure to provide deputies with tasers in November 2008 violated POST or statutory requirements.

In sum, Williams's declaration fails to raise a genuine issue of disputed material fact with respect to a policy, practice, or custom of Mendota or the County that caused Plaintiffs a constitutional harm. Summary judgment in favor of Defendants is appropriate.

## II.   State Law Claims

Defendants also request summary judgment on Plaintiffs' state law claims. However, because the Court will grant summary judgment to Defendants on the federal causes of action, there are no longer any federal claims left in this case. Jurisdiction in this case is based on the presence of a federal question, and the Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367. Under 28 U.S.C. § 1367(c)(3), a district court may decline to exercise jurisdiction over supplemental state law claims if "the district court has dismissed all claims over which it has original jurisdiction." Generally, "when federal claims are dismissed before trial . . . pendent state claims should also be dismissed." Religious Tech. Ctr v. Wollersheim, 971 F.2d 364, 367-68 (9th Cir. 1992). When removal is based on the presence of a federal cause of action, a district court may remand pendent or supplemental state law claims to the state court once the federal claims have been eliminated. See Lee v. City of Beaumont, 12 F.3d 933, 937 (9th Cir. 1993). In fact, "it is generally preferable for a district court to remand

---

[14] Plaintiffs do not cite *Brown*, but, as quoted above, that case does discuss liability for a failure to "equip" officers with "specific tools to handle recurring situations." See Brown, 520 U.S. at 409-10. That statement was made in the context of training officers; it refers to ensuring that officers are trained how to react in recurring situations. See id. Further, it does not appear "highly predictable" that not arming deputies with tasers, but arming them with other non-lethal or less lethal equipment, will result in more cases of excessive force. See id.

17

Case 1:10-cv-00618-AWI-BAM   Document 115   Filed 09/26/12   Page 18 of 19

remaining pendent claims to state court." Id.

Here, considering judicial economy, convenience, fairness, and comity, and because summary judgment has been granted on all of Plaintiffs' federal claims, the Court will decline to exercise supplemental jurisdiction over the remaining state law claims. See Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 350 n.7 (1988); City of Colton v. Am. Promotional Events, Inc.-West, 614 F.3d 998, 1008 (9th Cir. 2010) ("Because the district court did not err in granting summary judgment on the federal claims, it did not abuse its discretion in dismissing the state-law claims."); Lee, 12 F.3d at 937; Religious Tech., 971 F.2d at 367-68. Issues of compliance with the California Claims Act are best left for the Superior Courts. Further, Plaintiffs are alleging a negligence cause of action based on the officer's conduct. The Ninth Circuit certified a related negligence question to the California Supreme Court. See Hayes v. County of San Diego, 658 F.3d 867 (9th Cir. 2011). The California Supreme Court accepted the question, and the issue is awaiting a decision by the California Supreme Court. See Hayes v. County of San Diego, 2011 Cal. LEXIS 8139 (Aug. 10, 2011). It is better for the Superior Court to handle this currently unsettled state law negligence issue under these circumstances. Cf. 28 U.S.C. § 1367(c)(1).

**CONCLUSION**

Defendants move for summary judgment on the claims against them.

With respect to the federal causes of action, summary judgment is appropriate because exclusion of the pertinent opinions by Williams in his declaration is proper under Rule 37(c)(1). Without the opinions in Williams's declaration, there is no evidence to support *Monell* liability. Alternatively, the substance of Williams's *Monell* related opinions are insufficient to show that a constitutional injury was suffered as a result of a deliberately indifferent policy, practice, or custom.

With respect to the state law claims, the Court declines to exercise supplemental jurisdiction pursuant to 28 U.S.C. § 1367(c)(3). Instead, the Court will remand the remaining state law claims to the Fresno County Superior Court.

18

remaining pendent claims to state court." Id.

Here, considering judicial economy, convenience, fairness, and comity, and because summary judgment has been granted on all of Plaintiffs' federal claims, the Court will decline to exercise supplemental jurisdiction over the remaining state law claims. See Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 350 n.7 (1988); City of Colton v. Am. Promotional Events, Inc.-West, 614 F.3d 998, 1008 (9th Cir. 2010) ("Because the district court did not err in granting summary judgment on the federal claims, it did not abuse its discretion in dismissing the state-law claims."); Lee, 12 F.3d at 937; Religious Tech., 971 F.2d at 367-68. Issues of compliance with the California Claims Act are best left for the Superior Courts. Further, Plaintiffs are alleging a negligence cause of action based on the officer's conduct. The Ninth Circuit certified a related negligence question to the California Supreme Court. See Hayes v. County of San Diego, 658 F.3d 867 (9th Cir. 2011). The California Supreme Court accepted the question, and the issue is awaiting a decision by the California Supreme Court. See Hayes v. County of San Diego, 2011 Cal. LEXIS 8139 (Aug. 10, 2011). It is better for the Superior Court to handle this currently unsettled state law negligence issue under these circumstances. Cf. 28 U.S.C. § 1367(c)(1).

**CONCLUSION**

Defendants move for summary judgment on the claims against them.

With respect to the federal causes of action, summary judgment is appropriate because exclusion of the pertinent opinions by Williams in his declaration is proper under Rule 37(c)(1). Without the opinions in Williams's declaration, there is no evidence to support *Monell* liability. Alternatively, the substance of Williams's *Monell* related opinions are insufficient to show that a constitutional injury was suffered as a result of a deliberately indifferent policy, practice, or custom.

With respect to the state law claims, the Court declines to exercise supplemental jurisdiction pursuant to 28 U.S.C. § 1367(c)(3). Instead, the Court will remand the remaining state law claims to the Fresno County Superior Court.

**<u>ORDER</u>**

Accordingly, IT IS HEREBY ORDERED that:

1. Summary judgment in favor of Defendants on Plaintiffs's First, Second, and Third Causes of Action is GRANTED;
2. The Court declines to exercise supplemental jurisdiction over the remaining state law claims;
3. All currently set dates and deadlines, including the trial and pre-trial conference, are VACATED; and
4. This case is REMANDED forthwith to the Fresno County Superior Court.

IT IS SO ORDERED.

Dated:     September 25, 2012                              /s/ signature
                                                          CHIEF UNITED STATES DISTRICT JUDGE